## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MASIMO CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11-742-LPS-MPT |
| | ) | |
| PHILIPS ELECTRONICS NORTH | ) | **JURY TRIAL DEMANDED** |
| AMERICA CORPORATION and PHILIPS | ) | |
| MEDIZIN SYSTEME BÖBLINGEN GMBH, | ) | |
| | ) | |
| Defendants. | ) | |

## JOINT BRIEF REGARDING REMAINING PENDING OBJECTIONS TO THE REPORT AND RECOMMENDATION REGARDING CLAIM CONSTRUCTION

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
MORRIS, NICHOLS, ARSHT & TUNNEL LLP
1201 North Market Street
P. O. Box 1347
Wilmington, DE  19899
Tel:  (302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

*Attorneys for Plaintiff*


Dated:  September 10, 2015
1203336 / 33976

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

I.   Philips' Objection to the Recommendation Regarding the "Confidence" Terms
(Masimo's '400 Patent) ........................................................................................ 1

    A.   Philips' Objection ................................................................................... 1

    B.   Masimo's Response ................................................................................. 4

II.  Philips' Objection to the Recommendation Regarding the "Adjustably Smoothing"
Terms (Masimo's '400 Patent) ............................................................................ 9

    A.   Philips' Objection ................................................................................... 9

        1.   The Report's Construction of "Adjustably Smoothing" Does Not
Define or Explain This Claim Term ......................................... 10

        2.   The Report's Recommendation Does Not Take Into Account the
'400 Patent's Specific Explanation of "Adjustably Smoothing" ............. 10

        3.   The Report's Recommendations Regarding the "Speed of
Smoothing" Terms Fail for the Same Reasons ....................................... 13

    B.   Masimo's Response ............................................................................... 14

        1.   The Report Correctly Construed "adjustably smoothing" To Mean
"variably averaging" ................................................................. 14

        2.   The Report Correctly Construed The Speed Of Smoothing Terms ......... 16

III. Philips' Objection to the Recommendation Regarding "Said Scan" (Masimo's '850
Patent) ................................................................................................................ 17

    A.   Philips' Objection ................................................................................. 17

    B.   Masimo's Response ............................................................................... 19

IV.  Masimo's Objection to the Recommendation Regarding "Concentration" (Philips'
'745 Patent) ........................................................................................................ 19

    A.   Masimo's Objection .............................................................................. 19

    B.   Philips' Response ................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

<small>C</small>ASES

Page(s)

*Epistar Corp. v. Int'l Trade Comm'n*,
  566 F.3d 1321 (Fed. Cir. 2009).............................................................................5

*Halliburton Servs. v. Smith Int'l, Inc.*,
  No. 4:02-CV-269, 2004 WL 305722 (E.D. Tex. Feb. 13, 2004)......................................3, 7, 8

*Intel v. Broadcom*,
  172 F. Supp. 2d 478 (D. Del. 2001)........................................................................3

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004)..........................................................................5, 8, 9

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
  433 F.3d 1373 (Fed. Cir. 2006).........................................................................4, 5, 9

*Lucent Techs., Inc. v. Gateway, Inc.*,
  525 F.3d 1200 (Fed. Cir. 2008).........................................................................18, 19

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
  474 F.3d 1323, 1333 (Fed. Cir. 2007).....................................................................8

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008), aff'd, 449 F. App'x (Fed. Cir. 2011)..................................10

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003)...........................................................................22

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)...........................................................5, 12, 15, 16

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
  653 F.3d 1296 (Fed. Cir. 2011)...................................................................3, 4, 12, 15

*Seachange Int'l Inc. v. C-COR Inc.*,
  413 F.3d 1361 (Fed. Cir. 2005)............................................................................4

*Tandon v. ITC*,
  831 F.2d 1017 (Fed. Cir. 1987)..........................................................................13

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002).............................................................................5

*Toro Co. v. White Consol. Indus., Inc.*,
  199 F.3d 1295 (Fed. Cir. 1999)..............................................................................................4

*Transcenic, Inc., v. Google Inc.*,
  C.A. No. 11-582-LPS, 2013 U.S. Dist. LEXIS 132564
  (D. Del. Sept. 17, 2013) ........................................................................................................7

Pursuant to the Court's Order during the Status Conference on July 22, 2015, the parties hereby submit this joint brief setting forth the parties' objections to Magistrate Thynge's *Markman* Report and Recommendation (D.I. 750) that remain pending in view of recent case developments.  *See* 7/22/2015 Tr. at 49:24-50:9.  This joint brief includes all arguments on the remaining objections from the parties' prior briefing (D.I. 751, 752, 755, and 756) and does not contain any new argument not previously presented.

I.   **PHILIPS' OBJECTION TO THE RECOMMENDATION REGARDING THE "CONFIDENCE" TERMS (MASIMO'S '400 PATENT)**[1]

   A.   **Philips' Objection**

The Report recommends that the "confidence" terms be construed to mean "determination of the level of certainty that the signal accurately represents a physiological parameter."  This proposed construction should be rejected because it is far broader than the limited disclosure of the specification and not supported by any intrinsic evidence.   Indeed, the specification uses the word "confidence" only eight times, each time explicitly equating a determination of "confidence" with a determination of whether there is noise due to "motion." *See, e.g.,* D.I. 688, Ex. 21.  Accordingly, the "confidence" terms should be construed to mean a "determination of whether noise due to patient motion exists in the intensity signals," as Philips proposes.

As discussed in the Joint Brief, the specification's only disclosure of using "confidence" in the detected signals is with respect to "High Confidence Test" module 570.  *See* D.I. 686 at 46-47; D.I. 688, Ex. 3 ('955 Patent) at Fig. 19 and 47:35-66.  This module examines the width of the detected peaks, "which provides some indication of motion by the patient—wider peaks

---

[1] Philips' original objection included the "confidence" terms in the '955 and '572 Patents. Since the '955 Patent has been stayed and the '572 Patent has been dismissed, Philips objection is only applicable to the "confidence" terms in the '400 Patent.

indicating motion."  *See* D.I. 688, Ex. 3 ('955 Patent) at 47:35-40.  Based on the output of

module 570, a "smoothing filter" is selected by a "Select Smoothing Filter" module 568 "based

on the confidence level."  D.I. 688, Ex. 3 at 47:41-44 ("if peaks are wide, the smoothing filter is

slowed down.  If peaks are narrow, the smoothing filter speed is increased.").  This selection is

based on whether noise due to patient motion exists:

- "***During high confidence (no motion)***, the smoothing filter is a simple one-pole or exponential smoothing filter. . . ."  *Id.* at 47:57-59 (emphasis added).
- "***During motion condition***, a three-pole IIR (infinite impulse response) filter is used."  *Id.* at 47:65-66 (emphasis added).

The section of the specification discussed above (cols. 46-48) inextricably links

determining "confidence" in the detected signals with determining whether or not motion exists.

No other determination of "confidence" is disclosed or contemplated.  Certainly, there is no

discussion or suggestion that a determination of "confidence" broadly means a determination of

"the level of certainty that the signal accurately represents a physiological parameter," as the

Report recommends.  Notably, the Report does not cite to any portion of the specification or

prosecution history.  Rather, the Report's proposed construction appears to have originated with

Masimo's counsel's definition of the word "confidence" during the Markman hearing.  *See*

Hearing Tr. (5/22/2013) at 71:20-72:8 ("I think I would offer that determination of confidence,

really what we are talking about here is determining a level of certainty or a level of sureness that

the signal accurately represents the physiological parameters.").  That proposal, however, was

not based on the intrinsic evidence and is in fact far broader than what the specification actually

discloses.

The specification's use of "motion" in parentheses after "confidence" also supports

Philips' construction.  D.I. 688, Ex. 3 at 47:57-59 ("During high confidence (no motion). . . .").

While the parenthetical is not an explicit definition of the term, it is certainly instructive of the

intended meaning of "confidence."  For example, in *Intel v. Broadcom*, this Court found that inventors explicitly gave meaning to certain claim terms by providing explanatory parentheticals for the terms "source node" and "destination node."  *Intel v. Broadcom*, 172 F. Supp. 2d 478, 495 (D. Del. 2001).  Similarly, in *Halliburton Services v. Smith International*, the Eastern District of Texas found that the patent abstract's explanation that the invention ". . . equalizes the downforce (axial force). . . ."  was strong evidence that the drafter intended "downforce" and "axial force" to have the same meaning.  *Halliburton Servs. v. Smith Int'l, Inc.*, No. 4:02-CV-269, 2004 WL 305722, at *5-6 (E.D. Tex. Feb. 13, 2004).  Here, the parenthetical after "high confidence" is strong evidence that Masimo intended  "high confidence" to mean the absence of "motion" in the detected signal.

Instead of relying on the very limited and clear disclosure in the specification concerning the meaning of "confidence," the Report bases its recommendation solely on the doctrine of claim differentiation.  *See* D.I. 750 at 24 ("The court concludes the doctrine of claim differentiation is determinative of the dispute.").  Specifically, the Report finds that adoption of Philips' construction "would make each of [dependent claims 8, 15, and 23] superfluous" and that "Philips' arguments do not rebut the presumption that 'different claims are of different scope.'"  *Id.* at 25.  However, the Report does not indicate how Philips' arguments fail to rebut the presumption created by claim differentiation.  Nor does the Report cite any support other than the different claims as support for the broad recommended construction.

The canon of claim differentiation is not an absolute rule.  When the specification requires a specific construction based on limited disclosure, claim differentiation cannot be used to trump that specific construction.  *See, e.g., Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (finding claim differentiation to be rebutted where

"the specifications do not disclose a body that consists of multiple pieces or indicate that the body is anything other than a one-piece body"); *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1302 (Fed. Cir. 1999) ("the doctrine of claim differentiation does not serve to broaden claims beyond their meaning in light of the specification").  Indeed, the presumption "will be overcome by a contrary construction dictated by the written description."  *Seachange Int'l Inc. v. C-COR Inc.*, 413 F.3d 1361, 1369-75 (Fed. Cir. 2005).  Here, the specification clearly equates "confidence" with motion each of the eight times the word is used in the patent.  While the claims themselves may be broader than this limited meaning, there is simply no support for that broader meaning in the specification.  As the Federal Circuit held in *Retractable Techs.*, claims cannot be given broad scope based solely on the fact that they "leave open the possibility" of encompassing features that are not disclosed in the specification.  *Retractable Techs.*, 653 F.3d at 1305.  The '400 Patent simply does not offer any guidance for generally determining a "level of certainty that the [detected signals] represent a physiological parameter;" nor does the Report cite any support.  Claims "must be interpreted[] in light of the written description, ***but not beyond it***, because otherwise they would be interpreted to cover inventions or aspects of the invention that have not been disclosed."  *See, e.g., LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 433 F.3d 1373, 1375 (Fed. Cir. 2006) (emphasis added).  The broad construction adopted by the Report goes well beyond the limited disclosure of the specification, and thus should be rejected.  Because Philips' proposed construction is wholly consistent with the meaning ascribed to "confidence" in the specification, it should be adopted.

## B.    Masimo's Response

The Report correctly applied the ordinary meaning of "signal confidence" and thus properly rejected Philips' construction requiring a "determination of whether ***noise due to patient motion exists*** in the intensity signals." The Report correctly recognized that the doctrine

of claim differentiation creates "a presumption that each claim in a patent has a different

scope. . . . That presumption is *especially strong* when the limitation in dispute is the only

meaningful difference between an independent and dependent claim . . . ." D.I. 750 at 24. The

Report correctly determined that "the only difference, not merely the only meaningful difference,

between claims 8, 15, and 23 [of the '400 Patent] and the claims from which each depends is that

the 'signal confidence' determination is 'based on a determination of the presence of motion

induced noise.'" D.I. 750 at 25. As a result, the Report correctly determined that Philips'

arguments did not "rebut the presumption that 'different claims are of different scope.'" *Id.*

     Philips' objections fail to acknowledge the rule that "the words of a claim are generally

given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13

(Fed. Cir. 2005) (*en banc*). Thus, there is a "heavy presumption that claim terms carry their full

ordinary and customary meaning," *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334

(Fed. Cir. 2009); *see Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

One may depart from the ordinary meaning only in limited circumstances, such as where the

inventor acts as a lexicographer or clearly disavows claim scope. *See Teleflex*, 299 F.3d at 1325

(ordinary meaning applies unless there is an "express intent to impart a novel meaning to claim

terms"). No such exception applies in this case. As the Federal Circuit held in *Liebel-Flarsheim*

*Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004), claims should "not be read restrictively

unless the patentee has demonstrated a clear intention to limit the claim scope using words or

expressions of manifest exclusion or restriction."

     Philips incorrectly argues that "the specification uses the word 'confidence' only eight

times, ***each time explicitly equating*** a determination of 'confidence' with a determination of

whether there is noise due to 'motion.'" D.I. 752 at 2 (emphasis added). The Patents simply use

the term "confidence" in accordance with its ordinary meaning, as shown by the exemplary

excerpt repeated below:

> In order to obtain arterial oxygen saturation, the peak in the power curves corresponding to the highest saturation value could be selected. However, to improve ***confidence*** in the value, further processing is completed.

*See*, *e.g.*, JA Ex. 4 ('400 Patent) at 45:36-39 (emphasis added). The Patents describe one way of

improving confidence using a calculation of width for selected peaks:

> The peak width for these selected peaks is also calculated. The peak width of a power curve in question is computed by summing all the points in the power curve and subtracting the product of the minimum value in the power curve and the number of points in the power curve. In the present embodiment, the peak width calculation is applied to each of the bin power curves. The maximum value is selected as the peak width.

*See*, *e.g.*, *id.* at 46:18-25. This description of the peak width calculation never explicitly states

that peak width is only dependent on whether motion is present. To the contrary, the Patents

explain that "[t]he width of the peaks provide ***some indication*** of motion by the patient – wider

peaks indicating motion." *See*, *e.g.*, *id.* at 46:57-58 (emphasis added). The phrase "some

indication" can hardly be considered ***explicitly equating*** "confidence" with "determination of

whether noise due to patient motion exists," as argued by Philips.

Moreover, the Patents disclose numerous types of noise that affect peak width, including

artifacts due to patient movement, respiration artifacts, and "several other parameters." *See*, *e.g.*,

*id.* at 4:55-5:11. Figure 18 illustrates one embodiment where the pulse oximetry signals are

provided to a joint process estimator to calculate bin power curves. The Patents explain that the

power curve output depends on the amount of noise in the signal, and in particular the Patents

identify ***both*** respiration noise and motion induced noise as types of noise that affect the output.

*See*, *e.g.*, *id.* at 45:5-10. Peaks in the power curve are then identified, and the peak width is

calculated. *Id.* at 46:10-25. Thus, the peak width is affected by at least both respiration noise and

motion induced noise. While the specifications state that the "width of the peaks provides *some* indication of motion by the patient," they do not state that patient motion is the *only* source of noise that would cause wide peaks. *Id.* at 46:56-58 (emphasis added). Thus, the Patents do not support improperly limiting the claim to noise due to patient motion as Philips argues.

Philips places great weight on a single sentence in the Patents that recites "[d]uring high confidence (no motion), the smoothing filter is a simple one-pole or exponential smoothing filter . . ." D.I. 752 at 2-4. But this sentence does not define the term confidence. Rather, "no motion" in parenthesis merely provides an example of when there might be high confidence. *See Transcenic, Inc., v. Google Inc.*, C.A. No. 11-582-LPS, 2013 U.S. Dist. LEXIS 132564, *16 (D. Del. Sept. 17, 2013) (statement in the specification "the orientation of the camera (pitch, roll, and yaw)" was not a definition of "orientation.") This single sentence provides no indication that the inventors intended to limit the scope of their claims to require patient motion as the measure of confidence, especially in view of the remainder of the Patents' disclosure and claim differentiation.

Philips also has misstated this Court's holding in *Intel v. Broadcom*, 172 F. Supp. 2d 478 (D. Del. 2001). D.I. 752 at 3. In that case, the specification recited "a source node (*i.e.* has the capability to transmit data) and as a destination node (*i.e.* has the capability to receive data)." *Intel*, 172 F. Supp. 2d at 495 (emphasis added). This Court determined that linking the terms to the phrases in parenthesis through the use of the term "*i.e.*" was definitional. In the present case, however, the '955, '400, and '572 Patents never use the term "*i.e.*" to define confidence.

Philips also left out important details in its recitation of *Halliburton Servs. v. Smith Int'l, Inc.*, No. 4:02-cv-269, 2004 WL 305722 at *5-6 (E.D. Tex. Feb. 13, 2004). D.I. 752 at 3. In that case, the parties offered mutually exclusive claim constructions: one arguing "axial force"

*always* means "downforce," the other arguing "axial force" *never* means "downforce." *Id.* The

court relied on the ordinary meaning and the phrase "downforce (axial force)" in the

specification to adopt the always "downforce" construction. 2004 WL 305722 at *4-6. In

contrast, in the present case, the parties' proposed constructions are not mutually exclusive.

Masimo agrees that "confidence" can be based on the presence of motion, but it can also be

based on other factors. As the Report concluded, the dependent claims show this.

Philips also cited several cases for the proposition that "[w]hen the specification requires

a specific construction based on limited disclosure, claim differentiation cannot be used to trump

that specific construction." D.I. 752 at 4-5. Those cases are inapposite because the '955, '400,

and '572 Patents are not limited in their disclosure. Rather, the Patents identify, for example,

*both* respiration noise and motion induced noise. *See*, *e.g.*, JA Ex. 4 ('400 Patent) at 45:5-10. But

even if the Patents only identified motion induced noise as the way to determine confidence, the

Report correctly acknowledged Federal Circuit precedent that it is "'not enough that the only

embodiments, or all of the embodiments, contain a particular limitation,'" and that courts "'do

not read limitations from the specification into the claims; we do not redefine words. Only the

patentee can do that. To constitute disclaimer, there must be a clear and unmistakable

disclaimer.'" D.I. 750 at 3 (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362,

1366-67 (Fed. Cir. 2012); s*ee also Liebel-Flarsheim,* 358 F.3d at 906 ("Even when the

specification describes only a single embodiment, the claims of the patent will not be read

restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using

words or expressions of manifest exclusion or restriction.") (internal quotation marks omitted);

*MBO Labs., Inc. v. Becton, Dickinson* & *Co.,* 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("[P]atent

coverage is not necessarily limited to inventions that look like the ones in the figures . . . . To

hold otherwise would be to import limitations onto the claim from the specification, which is fraught with 'danger.'").

Finally Philips cites to *LizardTech* stating that claims "must be interpreted in light of the written description, but not beyond  it." D.I. 752 at 5. Philips never mentions that this quotation comes from a concurring opinion in support of the denial of rehearing en banc. *Id.* (quoting *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 433 F.3d 1373, 1375 (Fed. Cir. 2006) (Lourie, J., concurring in denial of rehearing *en banc*). Philips also ignores that the *LizardTech* rehearing concerned the viability of the written-description defense, not claim construction. As Judge Rader noted in his dissent from the order denying rehearing:

> [I]n *Phillips* itself, this court gave the broad claim term 'baffle' a meaning beyond the narrower bullet-deflecting embodiments in the specification. *Phillips* thus underscored that claim language governs and may exceed the scope of the specification's preferred embodiments. With that recent *en banc* rule in place, the written description analysis of *LizardTech* is troubling, if not inexplicable.

*LizardTech,* 433 F.3d at 1377-78 (Rader, J., dissenting in denial of rehearing *en banc*).

In sum, the Report correctly determined that "the doctrine of claim differentiation is determinative of the dispute," and Philips' arguments "do not rebut the presumption that different claims are of different scope." D.I. 750 at 24-25 (citations omitted). Accordingly, the Report correctly did not import limitations into the construction of the "confidence" terms. If those terms need construction, the Report correctly determined, based on ordinary meaning, that "determination of confidence in the accuracy of physiological signals" means "determination of the level of certainty that the signal accurately represents a physiological parameter."

## II.     PHILIPS' OBJECTION TO THE RECOMMENDATION REGARDING THE "ADJUSTABLY SMOOTHING" TERMS (MASIMO'S '400 PATENT)

### A.     Philips' Objection

The Report recommends construing "adjustably smoothing" to mean "variably

averaging" and the related "speed of smoothing" terms[2] to mean "use less averaging" and "use more averaging."  D.I. 750 at 30-32.  These constructions should be rejected because they merely substitute words and do not define what the claims actually mean.  Furthermore, the constructions are overbroad given the '400 Patent's very specific disclosure of how to "adjustably smooth" a plurality of values.

1.    **The Report's Construction of "Adjustably Smoothing" Does Not Define or Explain This Claim Term**

The Report's recommended construction ("variably averaging") simply substitutes the term "variably" for "adjustably" and "averaging" for "smoothing."  However, these alternate words do not define or explain what "adjustably smoothing" means, particularly as it is used in the claims of the '400 Patent.  Indeed, while a jury may understand the common concept of "averaging," a jury will not understand what is meant by "variably averaging" and the specification does not provide any guidance, as discussed below.  Indeed, the Report's construction is no more helpful than the original claim language and will likely result in further disputes over the meaning of the claims.  *See, e.g., O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (reiterating that the purpose of claim construction is "to clarify and when necessary to explain what the patentee covered by the claims"), *aff'd*, 449 F. App'x (Fed. Cir. 2011).  To the contrary, Philips' proposed construction explains exactly what is meant by "adjustably smoothing" in light of the specification and thus should be adopted.

2.    **The Report's Recommendation Does Not Take Into Account the '400 Patent's Specific Explanation of "Adjustably Smoothing"**

The Report focuses on the following section of the specification for the contention that

---

[2] The "speed of smoothing" terms are Terms 10 ("speed up the adjustable smoothing") and 11 ("slow down the adjustable smoothing").  *See* D.I. 750 at 31.

the '400 Patent contains a "broad description of adjustably smoothing:"

> The clip and smooth operation 566 basically performs averaging with a low pass filter. The low pass filter provides *adjustable smoothing* as selected by a Select Smoothing Filter module 568. The Select Smoothing Filter module 568 performs its operation based upon a confidence determination performed by a High Confidence Test module 570. The high confidence test is an examination of the peak width for the bin power curves. The width of the peaks provides some indication of motion by the patient--wider peaks indicating motion. Therefore, if the peaks are wide, the smoothing filter is slowed down. If peaks are narrow, the smoothing filter speed is increased. Accordingly, the smoothing filter 566 is adjusted based on the confidence level. The output of the clip and smooth module 566 provides the oxygen saturation values in accordance with the present invention

D.I. 750 at 29-30; D.I. 688, Ex. 4 ('400 Patent) at 46:50-54.

As the Report notes, the specification describes exactly how the smoothing is adjusted (*i.e.*, "sped up" or "slowed down").  Specifically the '400 Patent describes using filters that apply different weights to previous and new values depending on a property (*e.g.*, the presence of motion) of the detected signals.  D.I. 686 at 56-60; *see also* D.I. 688, Ex. 4 ('400 Patent) at 45:51-47:33 and Figure 19.[3]  Indeed, the Report acknowledges that this is "a specific way to making adjustments [sic] to the smoothing."  D.I. 750 at 30.  Despite this acknowledgement, however, the Report fails to recognize that the discussion of smoothing in Figure 19 and columns 45-47 and 50 is the underlined entirety of the discussion regarding adjustably smoothing.  Furthermore, this entire discussion is focused upon the use different filters, which assign different weights to new and old values, to "adjustably smooth" those values.  *See* D.I. 688, Ex. 4 ('400 Patent) at 47:8-14 ("During high confidence (no motion), the smoothing filter is a simple one-pole or exponential smoothing filter. . . .") and 47:15-16 ("During motion condition, a three-pole IIR (infinite impulse response) filter is used.").  Moreover, even Masimo's expert agrees that the selected

---

[3] The words "smooth" and "smoothing" only appear in the specification in Figure 19, columns 45-47 (discussing Figure 19), and column 50.  *See* D.I. 688, Ex. 22.

smoothing filter "takes each new saturation value and compares it to the current saturation value" by applying different weights to the values.  D.I. 688, Ex. 15 (Baura Decl.) ¶ 25 (explaining that each filter applies different weights to the newer and previous measurements).  Philips' proposed constructions are consistent with this specific disclosure, which is the only disclosure of "adjustably smoothing."  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 and 1323 (Fed. Cir. 2005) (en banc).

The Report's recommended construction of "variably averaging" would cover any form of averaging, without regard to the  very specific disclosure of the '400 Patent.  Indeed, the Report's sole support for its broad construction is the language of claims 1 and 18, which recite only "adjustably smoothing" without expressly limiting how the smoothing is accomplished.[4] D.I. 750 at 30.  While some of the claims may be written to be broader than what is disclosed, they cannot be used to trump the limited and specific disclosure of the specification, which necessarily informs the scope of the claims.  *See, e.g., Retractable Techs.,* 653 F.3d at 1305. There is no suggestion anywhere in the specification that any other type of averaging could be performed aside from assigning weights as Philips' proposed construction explains.  While Masimo now suggests an alternative –changing the time period used for averaging—this is nowhere contemplated in the patent.  *See, e.g.,* Hearing Tr. (5/22/2013) at 137:20-138:5.

Moreover, the language in claims 1 and 18 cited by the Report was not part of the original application—it was added in response to a rejection of the originally-filed claims that did not recite adjustably smoothing.  *See* Ex. A ('400 Pros. Hist., 5/17/2010 Amend.) at 2-5. Even where claim differentiation suggests a broader construction, claims cannot "be broader than

---

[4] In contrast, claim 11 specifically states that the smoothing speed is increased "by giving a higher weight to the newest measurement" and decreased "by giving a higher weight to older measurements."  This is wholly consistent with the limited of disclosure of the '400 Patent.

what is contained in the specification and claims as filed." *Tandon v. ITC*, 831 F.2d 1017, 1024 (Fed. Cir. 1987). One of ordinary skill reading the patent would understand "adjustably smoothing" to be described specifically in the patent, and the term should not be construed without regard to that specific disclosure of applying different weights.

### 3.   The Report's Recommendations Regarding the "Speed of Smoothing" Terms Fail for the Same Reasons

With respect to the "speed of smoothing" terms, the Report recommends rejecting Philips' proposed constructions and construing the terms to mean "use less averaging" and "use more averaging" "[f]or similar reasons set forth with regard to 'adjustably smoothing.'" D.I. 750 at 31. These recommendations, however, are incorrect for the same reasons the Report's recommendation regarding "adjustably smoothing" is incorrect. First, the Report's proposed construction is ambiguous and no more helpful to the jury than the claims themselves. A lay juror will not understand what it means to use "more" or "less" averaging, and there is no support in the specification for the Report's broad recommended construction.

Second, as discussed above, the specification makes clear that the adjustable smoothing is accomplished by the use of different filters, as discussed above. D.I. 688, Ex. 4 (the '400 Patent) at 46:59-62. The "speed" of the filters is based on the amount of weight given to new or previous values—to "speed up" the filter, newer values are given more weight and to "slow down" the filter, newer values are given less weight. *Id.*; D.I. 689, Ex. 23 (Stone Decl.) ¶¶ 27-33. Because Philips' proposed constructions are consistent with this disclosure and provide guidance as to the meaning of the disputed terms, they should be adopted.

### B.   Masimo's Response

#### 1.   The Report Correctly Construed "adjustably smoothing" To Mean "variably averaging"

The Report correctly acknowledged that the "words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." D.I. 750 at 2 (quoting *Thorner*, 669 F.3d at 1365). The Report further correctly set forth the "two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Id*. (quoting *Thorner*, 669 F.3d at 1365). Finding no exception applied, the Report correctly construed the "smoothing" terms using their ordinary meaning.

During the *Markman* hearing, Philips agreed that "smoothing" means "averaging." D.I. 712 at 120:24-121:10 ("We agree that smoothing is averaging. . . . I, frankly, have no problem if the Court is comfortable that the jury will understand averaging, to replace that with averaging is fine.") Thus, the dispute should center on the meaning of "adjustably," which the Report construed to mean "variably."

However, Philips is not objecting to the Report's replacement of the term "variably" for the term "adjustably". Rather, Philips is rewriting the claims by improperly importing limitations. Philips argues that the simple phrase "adjustably smooth the plurality of values" should be construed to mean "reduce short term fluctuations in the physiological characteristic by combining the newest measurement and previous values with a weight assigned to each, where the weights are adjusted based on a determined property of the intensity signals." Philips' objections to the Report never even acknowledge this construction, much less explain why this construction would be understandable to a jury or how Philips chose the words in its construction.

14

Philips points to nothing in the intrinsic record that disclaims claim scope to justify deviating from the ordinary meaning of "adjustably smoothing." Instead, Philips argues that the claims must be construed to match "the very specific disclosure of the '400 Patent." D.I. 752 at 8. That is not the law. Philips cites to *Retractable Technologies* for support, but that case found several reasons to limit the claim scope, including distinguishing the invention over the prior art:

> In this case, while the claims leave open the possibility that the recited "body" may encompass a syringe body composed of more than one piece, the specifications tell us otherwise. They expressly recite that "the invention" has a body constructed as a single structure, ***expressly distinguish the invention from the prior art based on this feature***, and only disclose embodiments that are expressly limited to having a body that is a single piece.

*Retractable Techs.,* 653 F.3d at 1305 (emphasis added).

In its *en banc Phillips* decision, the Federal Circuit warned against Philips' approach of limiting claims to match a "specific disclosure" of a patent:

> [A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.

*Phillips*, 415 F.3d at 1323 (citing *Liebel-Flarsheim*, 358 F.3d at 906-08, and *Teleflex*, 299 F.3d at 1327). In *Phillips*, the *en banc* court held that the term "baffle" should be given its ordinary meaning and should not exclude structures that extended at a 90 degree angle, ***even though the patent did not disclose such structures***. *Phillips*, 415 F.3d at 1310, 1328.

Philips argues that "changing the time period used for averaging . . . is nowhere contemplated in the patent." D.I. 752 at 8. But Philips' argument ignores the disclosure in the '400 Patent of using smoothing filters with different time constants. *See*, *e.g.*, JA Ex. 4 ('400 Patent) at 47:8-20 (filter characteristics ". . . are controlled by three time constants $t_a$, $t_b$, and $t_c$

with values of 0.985, 0.900, and 0.94 respectively."). Thus, contrary to Philips' assertions, the time constants disclosed in the '400 Patent change the time period used for averaging.

Moreover, the '400 Patent specification describes adjustably smoothing as follows: "The clip and smooth operation 566 ***basically performs averaging*** with a low pass filter. The low pass filter provides ***adjustable smoothing*** . . . ." JA Ex. 4 ('400 Patent) at 46:50-53 (emphasis added). Thus, in the context of the '400 Patent, "adjustably smoothing" is described as basic averaging. Nothing in the intrinsic record supports Philips' unwieldy construction, just as the Report concluded.

Finally, Philips raises a new argument that, because the language in claims 1 and 18 cited by the Report was supposedly not part of the original application, the Report improperly compared those claims with claim 11. D.I. 752 at 8. But claim 1 was broad as originally filed, without the language at issue, and was ***narrowed*** by the amendment referenced by Philips. Further the argument accompanying the amendment stated that "the processing device is configured to adjustably smooth the output values." There was certainly no suggestion that the adjustable smoothing had to be accomplished, as Philips argues, by "reducing the short term fluctuations in the physiological characteristic by combining the newest measurement and previous values with a weight assigned to each, where the weights are adjusted based on a determined property of the intensity signals." Finally, Philips' citation to the 1987 opinion in *Tandon* about the breadth of claims is unhelpful now that the Federal Circuit has clarified this law in its 2005 *en banc* decision in *Phillips*.

### 2. The Report Correctly Construed The Speed Of Smoothing Terms

The Report also correctly construed "speed up the adjustable smoothing" to mean "use less averaging" and "slow down the adjustable smoothing" to mean "use more averaging." D.I. 750 at 32. As the Report recognized, "'more averaging' and 'less averaging' could entail

increasing or decreasing the window of time over which measurements are taken, as well as varying the weights assigned to particular measurements." D.I. 750 at 31.

Philips argues that the Report's construction is ambiguous, but Philips fails to identify any ambiguity in the construction. D.I. 752 at 9. Philips' argument that a lay jury will not understand "more" or "less" averaging is unfounded and unsupported. Philips' proposed construction, to the contrary, will surely introduce confusion. As the Report recognized, applying Philips' construction to Claim 11 creates the following redundancy: "the signal processing device is configured to ~~speed up the adjustable smoothing~~ *give higher weight to the newest measurement* by giving a higher weight to the newest measurement." D.I. 750 at 32. Further, Philips' construction of "slow down the adjustable smoothing" to mean "give lower weight to the newest measurement" would result in a similarly confusing rewrite of Claim 11: "the signal processing device is configured to ~~slow down the adjustable smoothing~~ *give lower weight to the newest measurement* by giving a higher weight to older measurements."

Philips' argument that its constructions are consistent with the disclosure is yet another attempt to import limitations into the claims without a proper basis. D.I. 752 at 9. Philips has not identified any express disclaimer of claim scope or special definition that would lead to its proposed construction.

## III.   PHILIPS' OBJECTION TO THE RECOMMENDATION REGARDING "SAID SCAN" (MASIMO'S '850 PATENT)

### A.   Philips' Objection

The Report recommends construing "said scan" to mean "the analysis to qualify the plurality of indication values to be considered as possible resulting indications for the physiological parameter."  D.I. 750 at 12.  That construction, proposed by Masimo, improperly rewrites claim 25 of the '850 Patent to remove "said scan" altogether, and should be rejected.

*See Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215 (Fed. Cir. 2008) ("courts may not redraft claims to cure a drafting error made by the patentee, whether to make them operable or to sustain their validity").  To the extent the Court determines that "said scan" is not indefinite for lack of antecedent basis and can be construed, the Court must construe it to be consistent with the only "scan" disclosed in the specification.[5]  Indeed, as Masimo admits in the Joint Brief, the "said scan" language is intended to refer to the originally claimed "scan" performed by the originally claimed "scan module:"

> The phrase 'said scan' was referring to the result of the scan module. Claim 66 was then amended to rename the 'scan module' to be 'an analysis module.'  Thus, 'said scan' was still referring to the result from this same module, even though the name of the module was amended.

*See* D.I. 686 at 22-23 (internal citations omitted).

Nonetheless, the Report recommends that the Court rewrite claim 25 to eliminate "said scan" altogether, as Masimo requests.  This should be rejected because "said scan" was clearly intended to refer to the saturation transform embodiment when it was presented to the USPTO. The fact that the claim is no longer focused on that embodiment is irrelevant.  The Court cannot rewrite the claim simply to preserve its validity.  *Lucent Techs.*, 525 F.3d at 1215.  Indeed, should the Court determine that "said scan" is not indefinite, the term should at least be construed in a manner consistent with the intended meaning of the phrase and the Report's finding as to the meaning of "scan . . ." in claim 45.  That is, to the extent the phrase can be construed, it must be construed to mean:  "examination of each of the plurality of possible values for the physiological parameter."

---

[5] While such a construction is not consistent with an "analysis module," it is the only possible construction for "said scan" that makes any sense given the specification's specific disclosure of scanning, as the Report acknowledges with respect to Term 1.  *See* D.I. 750 at 3-9.

### B.       Masimo's Response

The Report correctly determined that "said scan" in Claim 25 of the '850 Patent "refers to the result of the 'analysis module'" D.I. 750 at 12. The Report further correctly determined that Philips failed to establish by clear and convincing evidence that "said scan" is insolubly ambiguous. *Id.* Indeed, even Philips' objections offer a definition for "said scan," demonstrating that the phrase can be construed. D.I. 752 at 10. However, as even Philips acknowledges, Philips' newly proposed construction is contrary to the prosecution history and surrounding claim language. D.I. 752 n.7.

Philips incorrectly states that the Report's construction "eliminate[s] 'said scan' altogether." D.I. 752 at 10. Neither Masimo nor the Report advocate simply removing "said scan" from the claim. Rather, the Report correctly recognized "said scan" was a reference to the previously recited analysis module, and construed "said scan" to mean "the analysis to qualify the plurality of indication values to be considered as possible resulting indications for the physiological parameter." The Report did not "eliminate" anything from the claim.

## IV.   MASIMO'S OBJECTION TO THE RECOMMENDATION REGARDING "CONCENTRATION" (PHILIPS' '745 PATENT)

### A.       Masimo's Objection

Masimo objects to the Report's construction of "concentration" in Claim 10 of the '745 Patent. D.I. 750 at 48. During prosecution of the '745 Patent, Philips quoted a dictionary definition for "concentration," and then explained the application of the dictionary definition in view of the Stone prior art reference:

> Applicant observes that in Webster's New International Dictionary, Second Edition, concentration is defined as follows:
>
> 3. Of a solution, the relative content of dissolved material; It may be expressed in percentage by weight or by volume, in parts per

19

million, or in grams per liter.

Since the method of Stone does not disclose a procedure neither for *determining* the *actual quantity* of a chromophore substance within the blood nor of the quantity of water within a given volume of blood, it is *incapable* of providing a result expressed as "a percentage by weight or by volume", or expressed in "parts per million" or in "grams per liter". Referring to the above definition, in order to find the relative quantity of dissolved material", whether the dissolved material be oxygen or some other absorptive chromophore substance, it will typically be necessary to *determine*:

> (i) the *quantity of the substance*, e.g., water, in which the material is dissolved, and

> (ii) the *quantity of the dissolved material*.

Applicant respectfully submits that the patent to Stone does not disclose a technique for making either of these *determinations*, and hence does not teach a method for the *determination of concentration*.

D.I. 689-4 JA Ex. 14 ('745 Patent File History) at PHIL03210614. Thus to overcome the Stone reference, the applicant expressly disclaimed calculations that did not determine the quantity of the substance and the quantity of the dissolved material. Accordingly, based on this clear and unmistakable disclaimer, the proper construction for concentration is "the determined quantity of a dissolved material relative to the determined quantity of the substance in which the material is dissolved."

## B.    Philips' Response

The Report's construction for the term "concentration" in Philips' U.S. Patent No. 5,337,745 ("the '745 Patent") is correct.  The Report construed this term to mean "the quantity of an absorptive substance in the blood relative to the quantity or volume of solvent in the blood." D.I. 750, at 48.  In reaching this construction, the Report rejected Masimo's attempt to impose a construction reciting a "determined quantity" of both the solute and the solvent.  *Id.,* at 44-48.

In its Objections, Masimo does not specify how the Report erred, but merely reiterates its previous arguments contending that statements made to overcome the prior art during prosecution constitute a "clear and unmistakable disclaimer" such that Masimo's proposed construction is warranted.  D.I. 751 at 10.  Masimo is wrong, and the Report rejected this argument.  D.I. 750, at 47.

The key difference between the claimed invention of the '745 patent and the prior art is that the device of the '745 Patent measures concentration in quantitative terms, such as grams / deciliter, rather than in unitless percentages of standard pulse oximetry (e.g. an SpO2 of 86%). In other words, oxygen saturation ("SpO2") is simply a measurement of oxygenated hemoglobin divided by total hemoglobin.  In contrast, the "concentration" of the '745 Patent is a quantitative measure of a substance divided by the amount of solute in which it is dissolved; one substance appears in the numerator (e.g. hemoglobin), and a different substance appears in the denominator (e.g. water).  Whether the values for these substances are "determined," estimated, or approximated is beside the point; the only thing that is required is that one substance (a solvent) be present in a different substance (the solute).  That was the basis on which the prior art Stone reference was distinguished, as Stone provided only unitless SpO2 values.  *See* D.I. 686 at 95-96. That a dictionary definition was cited during prosecution to illustrate that specific point, does not read in every unrelated aspect of that definition into the claim.

Instead, as noted by the specification of the '745 Patent, no "determination" of either solvent or solute is required:  "[f]urthermore, the absolute concentration of water would not always need to be measured in order to determine a concentration."  D.I. 689, Ex. 7 at 6:6-8.  "In this case, the relative amount of bilirubin is divided by the relative amount of water, and multiplied by an estimate of the concentration of water in the blood, to produce quantitative

bilirubin concentration." *Id.* 5:58-60.  Accordingly, the Report correctly concluded that Stone was not distinguished based on whether the solute and solvent were "determined," but rather on the basis that a solute and solvent were utilized to calculate a quantitative value.  *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003) ("we have . . . consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope.").  Thus the Report's recommendation for this term should thus be adopted.


<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
</table>

MORRIS, NICHOLS, ARSHT & TUNNEL LLP

POTTER ANDERSON & CORROON LLP


By:   */s/ Jack B. Blumenfeld*

     Jack B. Blumenfeld (#1014)
     Jeremy A. Tigan (#5239)
     1201 North Market Street
     P. O. Box 1347
     Wilmington, DE  19899
     Tel:  (302) 658-9200
     jblumenfeld@mnat.com
     jtigan@mnat.com

*Attorneys for Plaintiff*

By:   */s/ Bindu A. Palapura*

     David E. Moore (#3983)
     Bindu A. Palapura (#5370)
     Stephanie E. O'Byrne (#4446)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, DE  19801
     Tel:  (302) 984-6000
     dmoore@potteranderson.com
     bpalapura@potteranderson.com
     sobyrne@potteranderson.com

*Attorneys for Defendants*

OF COUNSEL:

Joseph R. Re
Jon W. Gurka
Perry Oldham
Stephen Larson
Michelle Armond
Payson LeMeilleur
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street
Fourteenth Floor
Irvine, CA  92614

Karen Vogel Weil
Brian C. Horne
Mark D. Kachner
KNOBBE, MARTENS, OLSON & BEAR, LLP
10100 Santa Monica Boulevard, Suite 1600
Los Angeles, CA  90067

Adam B. Powell
KNOBBE, MARTENS, OLSON & BEAR, LLP
12790 El Camino Real
San Diego, CA  92130

M. Laurence Popofsky
Robert A. Rosenfeld
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105

Dated:  September 10, 2015
1203336 / 33976

OF COUNSEL

Alan M. Grimaldi
Brian A. Rosenthal
Ann Marie Duffy
Clinton H. Brannon
Brian K. Andrea
Cody I. Gillians
John X. Zhu
MAYER BROWN LLP
1999 K St. NW
Washington DC 20006
Tel:  (202) 263-3000

Steven Yovits
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: (312) 782-0600